2019 IL App (1st) 162567-U

No. 1-16-2567

Order filed October 23, 2019

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 4448 |
| | ) | |
| CORNELIUS DIGGINS, | ) | Honorable |
| | ) | Nicholas R. Ford, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE McBRIDE delivered the judgment of the court.
Justices Howse and Cobbs concurred in the judgment.

**ORDER**

¶ 1   *Held*: The trial court erroneously admitted other-crimes evidence of a prior sexual assault, but the error was harmless. We remand for the trial court to conduct a preliminary inquiry pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984).

¶ 2   Following a bench trial, defendant Cornelius Diggins was convicted of two counts of aggravated criminal sexual assault (720 ILCS 5/11-1.30(a)(1) (West 2014)) and aggravated robbery (720 ILCS 5/18-1(b)(1) (West 2014)) and sentenced to an aggregate sentence of 36 years' imprisonment. On appeal, he contends the trial court erred by (1) allowing in other-crimes

evidence and (2) failing to inquire into the factual basis of his posttrial claim of ineffective assistance of counsel, pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984). We affirm, but remand for the trial court to conduct a preliminary *Krankel* inquiry.

¶ 3      Defendant was charged with 16 counts of aggravated criminal sexual assault (Counts 1-16), 2 counts of aggravated kidnaping (Counts 17 and 18), and aggravated robbery (Count 19) of the victim T.B. The various counts of aggravated criminal sexual assault alleged defendant (1) committed separate acts of knowingly penetrating: (1) T.B.'s mouth with his penis (a) while threatening to use a firearm (Counts 1 and 2), (b) causing her great bodily harm, resulting in pain and soreness to her head (Counts 5 and 6), and (c) during the commission of other felonies (kidnaping and robbery) (Counts 9, 10, 11, and 12); and (2) T.B.'s vagina with his penis (a) while threatening to use a firearm (Counts 3 and 4), (b) causing her great bodily harm, resulting in pain and soreness to her head (Counts 7 and 8), and (c) during the commission of other felonies (kidnaping and robbery) (Counts 13, 14, 15, and 16).

¶ 4      Prior to trial, the State filed a motion to admit other-crimes evidence pursuant to section 115-7.3 of the Code of Criminal Procedure of 1963 (the Code) (725 ILCS 5/115-7.3 (West 2016)). The other-crimes evidence involved a 2008 incident that occurred less than a mile from the assault in the instant case. In the 2008 incident, defendant grabbed a woman, C.G., forced her into her car, groped her, and threatened to take her to another location to rape her. C.G. escaped and defendant fled in her car. In that case, defendant was charged with attempted aggravated criminal sexual assault, among other offenses, and pled guilty to vehicular invasion.

¶ 5      Following arguments on the motion, the trial court allowed the admission of other-crimes evidence, finding it more probative than prejudicial. The court noted the "striking similarities"

between the 2008 incident and the charged offense, which occurred in the same geographical area and involved victims of a similar age and the same "race and ethnicity." The court further found similarities in the manner in which defendant approached the victims and "the way in which he conducted these alleged interactions."

¶ 6    At trial, T.B. testified that at about 4 a.m. on February 13, 2014, she got off a bus on 87th Street and Ashland Avenue. As she walked down Ashland, T.B. heard footsteps behind her in the snow. She turned to walk through an empty lot and saw a man, whom she had never seen before, walking behind her. T.B. later identified defendant as the offender. Defendant grabbed T.B. by her coat or book bag, and told her that he had a "big a*** gun" and would shoot her if she did not comply with his commands. Defendant "kept putting his hands in his pocket," which "kind of looked like" he had a gun. T.B. identified defendant in court as the offender.

¶ 7    Defendant put his arm around T.B.'s neck and pulled her toward an alley. She believed he was going to rape her so she asked whether he had a condom. Defendant replied, "No, do you?" and she told him she did not. Once in the alley, defendant told T.B. to turn around, and he would kill her if she looked at him. Defendant then searched her pockets and took her wallet and phone. Although it was dark outside, T.B. was able to see defendant's face because the alley was illuminated by a streetlight. After taking her items, defendant started touching T.B.'s thighs. T.B. repeatedly told him "no," and "no, please, don't. I'm pregnant." She was "basically saying anything" so that defendant would leave her alone.

¶ 8    T.B. also asked defendant not to take her wallet and phone and said, "I will suck your d*** if you give me my phone and my wallet." She acknowledged defendant did not ask her to do that prior to her statement. T.B. thought she could fight him off once he returned her phone

and wallet. Defendant returned her items, and she "kind of froze." She told defendant she did not want to "do it." Defendant told her that he would count to five and if she refused, he would shoot her. T.B. pleaded with defendant but as he got closer to counting to five, she became scared. She got on her knees and placed defendant's penis, which he had taken out of his pants, in her mouth. Defendant kept one hand in his pocket. Defendant's penis was in T.B.'s mouth for "[l]ike a few seconds" and he ejaculated in her mouth.

¶ 9     Defendant then told T.B. to get up, and she spit out his ejaculate. He instructed her to turn around and bend over. Defendant pulled down her pants and attempted to "insert himself" in her by touching his penis to the outside of her vagina. Defendant was not able to fully insert his penis in T.B.'s vagina. She repeatedly begged him to stop, saying, "[P]lease don't do this. I'm pregnant. I'm pregnant. Don't do this. I have a fiancé." T.B. picked up her book bag and attempted to hit defendant, but he caught it and said "stop f*** playing."

¶ 10     Defendant instructed T.B. to get back on her knees and "suck his d***." T.B. told him that she did not want to, and defendant hit the left side of her face with what felt to her like a closed fist. T.B. cried, returned to her knees, and continued to perform oral sex. She put her hands in his pocket where he said he had a gun. She felt defendant's pockets to determine whether he actually had a gun, but she did not feel anything in his pockets other than a pen. While defendant's penis was in her mouth, he pushed T.B., put his penis back into his pants, and fled.

¶ 11     Once defendant had left, T.B. pulled her pants up, retrieved her book bag, and ran out of the alley towards 85th Street. She called 911 and gave a description of her attacker. Shortly thereafter, the police and an ambulance arrived. T.B. was initially treated in the ambulance.

While inside the ambulance, an officer approached and told her they had a person that matched the description she gave of her attacker. T.B. identified defendant as the man who attacked her.

¶ 12    Following the identification, T.B. was transported to the hospital where she told staff what occurred and agreed to submit to a criminal sexual assault kit. The kit involved an oral swab, a vaginal swab, combing her pubic hair area, and checking under her fingernails for her attacker's DNA. Hospital staff also took her underwear and coat to test for potential DNA from her attacker. T.B. received medication for treatment of any potential sexually transmitted infections. She was 29 years old at the time of trial.

¶ 13    On cross-examination, T.B. acknowledged that at the hospital, she denied that she was assaulted vaginally. Although T.B. initially believed defendant had a gun on the night in question, she acknowledged that he did not actually have one. T.B. did not have money or credit cards in her wallet. Defendant looked through her wallet prior to giving it back to her. When T.B. called 911, she described the offender as a black man with a medium complexion wearing a black "skull cap" and pea coat. When defendant punched her, he did not leave a bruise or mark.

¶ 14    On redirect, T.B. clarified she did not report a vaginal assault at the hospital but she reported that defendant's penis touched her vagina. She was given pregnancy prevention medication at the hospital.

¶ 15    Michael Relf, a paramedic for the Chicago Fire Department, testified he treated T.B. in an ambulance following a report that she had been sexually assaulted. When she first got into the ambulance, T.B. was crying, "very, very scared," and "very traumatized." Relf stood by the doors of the ambulance and heard T.B. speaking with his partner. T.B. told Relf's partner that she was walking down an alley and was approached by a man that tried to rob her and "forced

her to do oral sex on him." T.B. spit in an emesis bag because she said the man had ejaculated in her mouth. While T.B. was in the ambulance, officers pulled up next to the ambulance, opened the doors, flashed a light, and asked if she could identify her attacker. T.B. identified the man detained by the police. The paramedics subsequently transported her to the hospital. Relf acknowledged that T.B. reported forced oral sex but did not report a vaginal assault.

¶ 16    Nurse Nora Casasanto testified she treated T.B. on February 13, 2014. Casasanto obtained a history from T.B. regarding why she was at the hospital. T.B. reported to her that when she exited a bus near 87th and Ashland, someone approached her from behind, said he had a gun, and told her to give up her purse, wallet, and phone. T.B. further reported the man took her into an alley and she offered "to do anything" so he would leave her alone. The man told T.B., " '[D]o you want me to f*** you or *** would you like to suck my d***?' " T.B. reported that the man hit her from behind and attempted to penetrate her from behind, but was unsuccessful. However, "there was touching of the organs." The man then said " 'quit playing' " and turned her around and forced his penis into her mouth and "[a]pparently there was some ejaculation."

¶ 17    T.B. consented to a physical exam and sexual assault kit. Casasanto assisted the doctor for T.B.'s physical exam. For the sexual assault kit, Casasanto obtained oral and fingernail swabs and a pubic hair combing. She gave T.B. prophylactic medication to treat chlamydia, gonorrhea, and a yeast infection. T.B. also took Plan B as contraception to prevent pregnancy based on her report that the attacker's penis touched her vagina. T.B. reported she had a headache from being hit and she was nauseous, but there were no visible signs of trauma. When she had arrived at the hospital, T.B. had suffered from tachycardia, a rapid heartbeat. She was nervous, tearful, and

scared, but cooperative. Casasanto acknowledged that the treating physician's documentation noted T.B. had been punched and forced to have oral sex with an assailant but had denied a vaginal assault.

¶ 18    Chicago police officer Loughney testified he was working with his partner, Officer Guzman, on the day in question. They responded to a report of a sexual assault near 85th and Ashland. The officers spoke with T.B. at the scene. T.B. was distraught. She described the offender as a 5'10, 180-pound black man with a medium complexion, wearing a black skull cap, black pea coat, and jeans. Loughney relayed the description of the offender over the police radio and called an ambulance.

¶ 19    During the show-up identification, Loughney was standing between the ambulance and the police car. He heard T.B. identify the suspect as her attacker. Loughney identified defendant as the person T.B. identified at the show-up.

¶ 20    Chicago police officer S. Calderon testified that he was on duty at around 4:15 a.m. on February 1, 2014. Calderon and his partner, Officer Perez, received a flash message regarding a sexual assault while in their marked vehicle. The description given of the attacker was a 5'10, 180-pound black man with a medium complexion wearing a black skull cap, a black pea coat, and jeans. Calderon and Perez canvassed the area and, near 85th Street and Racine Avenue, about a quarter mile from where the assault was reported, the officers noticed a man matching the description "head to toe." Calderon identified defendant as the man he observed. Defendant was walking fast and glanced back at the officers multiple times.

¶ 21    Calderon and Perez approached defendant, who was wearing a black pea coat. Defendant told them he was coming from 83rd Street and Ashland, which was "very close" to where the

assault occurred. Calderon thereafter detained defendant and relocated to the scene for a show-up identification procedure. T.B. positively identified defendant as the offender who sexually assaulted her. The officers then placed defendant into custody and transported him to the police station. Defendant was in possession of $386.

¶ 22    On cross-examination, Calderon acknowledged defendant was wearing a hoodie sweatshirt in his booking photograph. Calderon believed they inventoried defendant's pea coat and skull cap prior to taking the booking photo. Defendant was wearing the skull cap during the show-up identification. Defendant was the only person the victim looked at during the show-up. He was handcuffed with another officer beside him during the identification.

¶ 23    Calderon acknowledged that he and Perez stopped another black man in the vicinity of the assault while they canvassed the area. That man "somewhat" matched the description of the offender. While the officers were talking to that man, Calderon noticed defendant, who "exactly" matched the description of the offender, due to his skull cap, pea coat, height, and weight.

¶ 24    Chicago police detective Wade Golab testified that he was assigned to investigate T.B.'s sexual assault. He spoke with T.B. at the hospital and learned that she identified defendant as her attacker. Golab spoke with defendant at the police station at about 8:30 a.m. on the day of the attack. Defendant waived his *Miranda* rights and told Golab that he was at a club near 79th and Ashland. Defendant left the club shortly after midnight and went to a club on Racine. He denied assaulting or having physical contact with anyone that evening. Golab asked defendant why someone would accuse him of rape, and defendant responded that if anyone accused him it would have been either a light-skinned girl from the first club or a dark-skinned "shorter" girl with a bag that he first saw walking on Racine and later on Ashland. With respect to the shorter

girl, defendant said she looked like she was upset so he went up to her and asked her what was wrong. Defendant told Golab that the girl said that she was too old for defendant and that he looked like a rapist. He then showed the girl that he had money and subsequently left her.

¶ 25    Defendant was charged around 1:30 p.m. that day. After 11:30 p.m., Golab was informed by a "lockup keeper" that defendant wished to speak with him again. No one else was present when Golab spoke with defendant again. Defendant informed Golab that he lied earlier and went into the alley with the girl. Defendant stated that he and the girl had agreed that she would give him oral sex for $30. However, defendant gave her only $10 and believed that was the reason "she was lying on him."

¶ 26    On cross-examination, Golab acknowledged he did not memorialize defendant's statement in writing or videotape. He could not recall who from the lockup informed him that defendant wished to speak with him again. Golab was not aware of any record showing he was notified that defendant had asked to speak with him a second time. He testified that he documented all of the statements defendant made to him in general progress reports and supplemental reports.

¶ 27    C.G. testified to previously allowed other-crimes evidence. She was 30 years old at the time of trial. At 10:30 p.m. on February 1, 2008, C.G. was at her prior residence near 79th Street and Marshfield Avenue to check the mail. The mailbox was in a storefront building with an alarm system. Because she had recently moved out of the building, she still had the code. As C.G. exited the building, two men attempted to force her back inside. C.G. identified defendant as one of the men. Defendant had something under his shirt that he placed against C.G.'s back. He told her it was a gun and said C.G. "better" let him into the building. She told defendant she

did not have access to the building, so the men forced her into her car. Defendant told her he would shoot her if she screamed and then "grabbed and groped on [her] bottom." Defendant got into the passenger seat, his friend got into the back seat, and C.G. got into the driver's seat.

¶ 28    Defendant asked C.G. for money and she told him she did not have any on her. Defendant said she was lying and screamed at her. He instructed C.G. to drive, but her car did not have gas so defendant told her to pull into a gas station. When C.G. parked at the gas station, defendant told her "he was going to do sexual things" to her. Defendant said he would take C.G. to his friend's house and "they were going to make [her] pop pills and get [her] high and run a train on [her]."

¶ 29    Defendant then gave his friend money for gas and his friend exited the vehicle. Defendant continued to tell C.G. what he was going to do to her sexually at his friend's house. He grabbed C.G.'s face and "shoved his tongue down [her] throat." C.G. attempted to pull away from defendant, but he threatened her with his gun. He put his hands in between her legs and "started feeling on [her] private area" over her clothes. Defendant touched her breasts and between her legs. She told him to stop, but defendant reminded her that he had a gun.

¶ 30    As defendant's friend was pumping gas into her car, C.G. attempted to "stall" and asked defendant if his friend could get her a drink from the gas station. As his friend exited the gas station, C.G. "darted out of the car." She ran into the gas station and screamed to the security guard to call the police. A police car happened to be driving into the gas station at that time. While C.G. was screaming, defendant drove away in her car. The police chased defendant up the street and he crashed her car. C.G. reported the incident and identified defendant in a lineup the following day. Defendant was ultimately charged and convicted of vehicular hijacking.

¶ 31    On cross-examination, C.G. acknowledged that she never saw the gun that defendant purportedly possessed. C.G. did not seek medical attention as a result of the incident. To her knowledge, defendant pled guilty to vehicular hijacking, but not a sex crime.

¶ 32    The parties stipulated that if called, Cook County State's Attorney investigator Mary Ember would testify that on June 5, 2014, she collected a buccal swab standard from defendant and inventoried it.

¶ 33    The parties further stipulated that if called, forensic scientist Jennifer Wagenmaker would testify, as an expert in forensic biology, that she tested the sexual assault kit collected from T.B. for the presence of semen. No semen was identified on the oral or vaginal swabs. Her examination of the anal swabs and the underwear were inconclusive. No saliva was indicated on the vaginal swabs. The anal swabs, a stain from T.B.'s underwear, and T.B.'s blood standard were preserved for future DNA analysis.

¶ 34    Finally, the parties stipulated that if called, forensic scientist Debra Klebacha would testify, as an expert in forensic DNA analysis, that she analyzed T.B.'s blood standard and obtained a DNA profile suitable for comparison. Likewise, she analyzed defendant's buccal swab and obtained a DNA profile suitable for comparison. She extracted DNA from the anal swab and the stain from T.B.'s underwear; however, there was insufficient male DNA detected to profile.

¶ 35    Defendant moved for a directed finding, and the court granted his motion with respect to the aggravated criminal sexual assault counts involving vaginal penetration (Counts 3, 4, 7, 8, 13, 14, 15, and 16).

¶ 36    In closing, defense counsel argued that the evidence was insufficient because T.B. was not credible, other men matching the description of the offender were near the scene, the show-up identification was unreliable, and Golab failed both to interview defendant with another officer and memorialize defendant's statements. Alternatively, counsel argued the encounter between defendant and T.B. was consensual because she offered oral sex in exchange for her belongings and knew defendant was not armed.

¶ 37    The court found defendant guilty of eight counts of aggravated criminal sexual assault relating to penetrating T.B.'s mouth with his penis (Counts 1, 2, 5, 6, 9, 10, 11, and 12) and aggravated robbery (Count 19). In so finding, the court noted the case involved a question of witness credibility. The court found that both T.B. and C.G. were compelling witnesses. The court indicated it did not believe the interaction between T.B. and defendant was consensual based on T.B.'s testimony that defendant pushed her toward an alley after indicating that he was armed. It found "[t]his is not a close case as it relates to the counts that remain."

¶ 38    With respect to the other-crimes evidence, the court stated:

> "I don't offer any regret or reluctance regarding the admission of that proof of other-crimes evidence in this case and my decision to allow in that circumstance was predicated on the fact though he ended up pleading to an offense other than one relating to his sexual conduct with the victim in that case, it was clear from the fact that was proffered and obviously now since I heard [C.G.'s] testimony that it is even more clear now that there was a strong sexual component and sexual offense committed by the Defendant along with the property offense that he would go on to be convicted of."

¶ 39    Defendant filed a motion for a new trial, arguing, in relevant part, that the trial court erroneously admitted other-crimes evidence because it was too dissimilar to the charged offenses and unduly prejudicial. The court denied defendant's motion. Additionally, the court, noting it had found defendant not guilty of aggravated kidnaping, acquitted him of the aggravated criminal sexual assault counts predicated on kidnaping T.B. (Counts 9 and 10). It merged the remaining six counts of aggravated sexual assault into Counts 1 and 2.

¶ 40    During the sentencing hearing, defense counsel argued in mitigation, "He does not, I believe, deserve a whack on this one. *** I don't think that there's a pattern of any sort here. If there's any sort of pattern, it's for taking people's property, for committing robberies." Defendant interjected:

"[DEFENDANT]: Excuse me, your Honor. Can I say something?

[DEFENSE COUNSEL]: My client vehemently disagrees with this line of argument because his defense has been, and continues to be that he wasn't there; however, given your Honor's finding, it's important to argue as if consistently with that finding. So in doing so, I would ask your Honor to grant him leniency. He again is going to disagree with that argument."

* * *

THE COURT: What would you like to say, [defendant]?

[DEFENDANT]: Your Honor, I'm not guilty of this crime. They grabbed me from off Racine and took me to Ashland and put me in a show-up/line-up. My counsel said I was guilty of consensual sex. I never agreed with her to even say something like that cause I never was -- I never did nothing to this lady. I don't even know this lady,

never seen her a day in my life. For her to say it was me because they described me as my description, which the police say they grabbed me. They never told me what was going on or anything. They put me in a 48 hour investigation. They took me to the police station. I had a show-up/line-up in the middle of the street. They took me from Racine all the way to Ashland. They put me in a show-up/line-up in the middle of the street, and they said I was positively identified. Of what, I do not know. I got to the police station. They put in a 48 hour investigation. They said they didn't -- they said I couldn't get no phone calls or anything. They brought me to the County, which I found out I was charged with these charges, you know what I'm saying.

So, far as assaulting anyone or anything like that, I never did do -- I never did none of that. They grabbed me from all the way over here. I could never be on this crime scene and did nothing to this lady like that. I don't know why I'm being pointed out. And for her to say I plead consensual sex, I did nothing like that. So I will be pleading, you know, ineffective counsel because that would be wrong, you know, just to say that I'm guilty of this crime when I'm not clearly. DNA, fingerprints, whatever else they have, you know, what I'm saying, which I stand in the courtroom to plead my innocence. Hopefully they come back and everyone can see the big picture, you know, what I'm saying. The police say they got two or three people they let go, and why would they do that if they fit the same description I fit and they grab me.

THE COURT: Thank you, [defendant]."

- 14 -

¶ 41    The court sentenced defendant to two 16-year terms for aggravated criminal sexual assault and a 4-year term for aggravated robbery. The court order the terms to run consecutively, for an aggregate sentence of 36 years' imprisonment. This appeal follows.

¶ 42    On appeal, defendant first contends that the trial court erred by admitting other-crimes evidence of the sex offense against C.G. pursuant to section 115-7.3 of the Code (725 ILCS 5/115-7.3 (West 2016)) because that offense was factually dissimilar from the charged crimes and unduly prejudicial.

¶ 43    Under the common law, other-crimes evidence is inadmissible to prove a defendant's propensity to commit the charged crime. *People v. Donoho*, 204 Ill. 2d 159, 169 (2003). Generally, evidence of other crimes is admissible only to show a specific, relevant purpose, such as consciousness of guilt, *modus operandi,* design, motive, absence of mistake, or knowledge. *People v. Banks,* 161 Ill. 2d 119, 137 (1994). However, section 115-7.3(b) of the Code outlines an exception to the rule against other-crimes evidence in criminal sexual assault cases. Under this section, evidence of another criminal sexual assault "may be admissible (if that evidence is otherwise admissible under the rules of evidence) and may be considered for its bearing on any matter to which it is relevant" (725 ILCS 5/115-7.3(b) (West 2016)), including a "defendant's propensity to commit sex offenses." *Donoho,* 204 Ill. 2d at 176. In admitting this evidence, the court must weigh the probative value of the evidence against the undue prejudice to the defendant and may consider "(1) the proximity in time to the charged offense; (2) the degree of factual similarity to the charged or predicate offense; or (3) other relevant facts and circumstances." 725 ILCS 5/115-7.3(c) (West 2016).

¶ 44     We will not disturb the trial court's decision to admit other-crimes evidence to show the defendant's propensity to commit sex offenses absent an abuse of discretion. *Donoho,* 204 Ill. 2d at 182. The trial court abuses its discretion when its " 'ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court.' " *People v. Wheeler,* 226 Ill. 2d 92, 133 (2007) (quoting *People v. Caffey,* 205 Ill. 2d 52, 89 (2001)).

¶ 45     Defendant contends only that the other-crimes evidence was too dissimilar to the charged offense and unduly prejudicial. Specifically, he argues the crime against C.G. involved two perpetrators and was "sexual from the beginning," whereas the incident with T.B. involved one offender and began as simple robbery until T.B. offered oral sex.

¶ 46     Here, we find the trial court abused its discretion by admitting the other crimes evidence because the 2008 crime was too dissimilar to the charged offense. Other-crimes evidence must have " 'some threshold similarity to the crime charged' " to be admissible. *Donoho*, 204 Ill. 2d at 185 (quoting *People v. Bartall*, 98 Ill. 2d 294, 310 (1983)). As factual similarities increase, so does the relevance, or probative value, of the other-crimes evidence. *Bartall*, 98 Ill. 2d at 310. Despite the trial court's assessment that the two crimes bore "striking similarities," the record shows significant differences between the two crimes. Notably, defendant had a partner in the 2008 offense and initially attempted to force C.B. into a locked residential building. In that case, defendant then forced C.B. into her car, where he groped her, forcefully kissed her, and threatened her with sexual assault before she was able to escape. By contrast, in the instant case, defendant alone approached T.B. and pulled her into an alley where he initially searched her and took her wallet and phone before twice forcing her to perform oral

sex. Although the crimes occurred in the same general geographical location, the facts of the crimes were not similar enough to support admissibility.

¶ 47    Nevertheless, we conclude the erroneous admission of the other-crimes evidence was harmless given the strength of the evidence against defendant. The improper admission of other-crimes evidence is harmless error where the defendant is not prejudiced or denied the right to a fair trial. *People v. Nieves*, 193 Ill. 2d 513, 530 (2000). At trial, T.B. testified that defendant walked up behind her, told her he had a gun, and pulled her into a nearby alley. In the alley, defendant threatened to shoot T.B. if she looked at him. He touched her thighs, and forced her to perform oral sex twice. Defendant ejaculated in T.B.'s mouth at one point. Eventually, T.B. escaped, called 911 and provided a description of her attacker. Near the scene of the offense, officers detained defendant, who matched the description "head to toe." T.B. identified defendant as her attacker shortly thereafter. See *e.g.*, *People v. Smith*, 185 Ill. 2d 532, 541 (1999) ("The testimony of a single witness, if it is positive and the witness credible, is sufficient to convict.").

¶ 48    In addition, both a paramedic and a nurse testified that on the day of the incident, T.B. had reported being forced to perform oral sex, and each recounted T.B. had been scared. Detective Golab testified defendant gave two different accounts of the incident and had acknowledged that T.B. performed oral sex on him, although he had maintained it was consensual. In light of this evidence, we cannot say the outcome of the trial would have been different had the other-crimes evidence been excluded. *People v. Johnson,* 406 Ill. App. 3d 805, 818 (2010) (finding improper admission of other-crimes evidence was harmless error where the outcome of the trial would not have been different in the absence of such evidence).

¶ 49   Next, defendant contends the trial court failed to conduct a proper inquiry pursuant to *Krankel* when he raised a claim of ineffective assistance of counsel at sentencing. Thus, defendant argues this court should remand his case for a proper preliminary *Krankel* inquiry.

¶ 50   Under *Krankel* and its progeny, where a defendant raises a *pro se* posttrial claim of ineffective assistance of counsel, the trial court must inquire into the factual basis of his claim. *People v. Moore*, 207 Ill. 2d 68, 77-78 (2003). If the defendant's claim indicates possible neglect by trial counsel, the trial court must appoint new counsel to argue the claim of ineffective assistance, pursuant to *Krankel*. *Id.* at 78. However, if the defendant's claim lacks merit or concerns solely trial strategy then the court may deny the motion and need not appoint new counsel. *Id.*

¶ 51   An adequate inquiry under *Krankel* requires " 'the trial court to conduct some type of inquiry into the underlying factual basis, if any, of a defendant's *pro se* posttrial claim of ineffective assistance of counsel.' " (Emphasis omitted.) *People v. Ayres*, 2017 IL 120071, ¶ 19 (quoting *Moore*, 207 Ill. 2d at 79). Such an inquiry may consist of the court asking defense counsel about the defendant's allegations, discussing the allegations with defendant, or resolving the motion based on its knowledge of defense counsel's performance and the "insufficiency of the defendant's allegations on their face." *Moore*, 207 Ill. 2d at 78-79. To trigger a *Krankel* inquiry, a defendant need only bring "a clear claim asserting ineffective assistance of counsel" to the court's attention. *Ayres*, 2017 IL 120071, ¶¶ 18, 19. Whether defendant sufficiently alleged ineffective assistance of counsel to warrant a *Krankel* inquiry is a question of law that we review *de novo*. *People v. Taylor*, 237 Ill. 2d 68, 75 (2010).

¶ 52    Here, the record shows defendant raised a posttrial claim of ineffective assistance of counsel prior to being sentenced. Defendant clearly stated he was "pleading *** ineffective counsel" after complaining of defense counsel's argument in mitigation that the encounter with T.B. was consensual. Although defendant was given an opportunity to speak and counsel had informed the court that defendant disagreed with her argument in mitigation, the court made no further inquiry or determination on the record regarding whether the claim potentially had merit as it was required to do under *Krankel*. See *Moore*, 207 Ill. 2d at 77-78. This was error.

¶ 53    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County and remand this cause to the trial court for the limited purpose of allowing the court to conduct the required preliminary inquiry into defendant's ineffectiveness claim.

¶ 54    Remanded with instructions.