2021 IL App (1st) 180564-U

THIRD DIVISION
May 26, 2021

No. 1-18-0564

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).
_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 0444801 |
| | ) | |
| CORNELIUS DIGGINS, | ) | Honorable |
| | ) | Nicholas R. Ford, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE McBRIDE delivered the judgment of the court.
Presiding Justice Howse and Justice Cobbs concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Defendant forfeited his claim of ineffective assistance of trial counsel by failing to raise the issue on direct appeal. Even if not forfeited, the trial court properly dismissed defendant's *pro se* postconviction petition at the first stage because defendant failed to set forth an arguable claim of ineffective assistance of trial counsel.

¶ 2   Defendant Cornelius Diggins appeals the trial court's first stage dismissal of his *pro se* postconviction petition, arguing that he raised the gist of a constitutional claim that his trial counsel was ineffective for failing to quash his arrest.

¶ 3    In March 2014, defendant was indicted on multiple counts of aggravated criminal sexual assault, aggravated robbery, and aggravated kidnapping related to the February 13, 2014 sexual assault and robbery of T.B. in Chicago.

¶ 4    The following evidence was presented at defendant's 2016 bench trial.

¶ 5    T.B. testified that at about 4 a.m. on February 13, 2014, she got off a bus on 87th Street and Ashland Avenue and she heard footsteps behind her as she walked down Ashland Avenue. When she turned to walk through an empty lot, she saw an unknown man walking behind her. T.B. later identified defendant at the scene as well as in court as the perpetrator. When defendant grabbed T.B., he told her that he had a "big a*** gun" and would shoot her if she did not comply with his commands. Defendant "kept putting his hands in his pocket," which "kind of looked like" he had a gun.

¶ 6    Defendant pulled her into an alley and threatened to shoot her if she looked at him. Defendant then searched her pockets and took her wallet and phone. Although it was dark outside, T.B. was able to see defendant's face because the alley was illuminated by a streetlight. T.B. asked defendant not to take her wallet and phone and offered to perform oral sex for her belongings. She acknowledged defendant did not ask her to do that prior to her statement and she thought she could fight him off once he returned her phone and wallet. After defendant returned her items, she told defendant she did not want to perform the sexual act. Defendant threatened to shoot her if she did not perform oral sex on him. T.B. then placed defendant's penis in her mouth until he ejaculated, which T.B. spat out of her mouth.

¶ 7    Defendant then pulled down her pants and attempted to "insert himself" in her by touching his penis to the outside of her vagina. Defendant was not able to fully insert his penis in T.B.'s vagina. T.B. pleaded with defendant not to sexually assault her and attempted to strike

him with her bag. Defendant forced T.B. to perform oral sex a second time and struck her when she told him she did not want to do it. She felt defendant's pockets, but she did not feel a gun. Defendant then removed his penis from T.B.'s mouth and fled.

¶ 8       Once defendant had left, T.B. called 911 and described the offender as a black man with a medium complexion wearing a black "skull cap" and pea coat. Shortly thereafter, the police and an ambulance arrived. While she was being treated in the ambulance, an officer approached and told her they had a person who matched her description of the perpetrator. T.B. identified defendant as the man who attacked her. Following the identification, T.B. was transported to the hospital and a sexual assault kit was performed.

¶ 9       Officer Loughney testified he and his partner responded to a report of a sexual assault near 85th and Ashland. The officers spoke with T.B. at the scene and she described the offender as a 5'10", 180-pound black man with a medium complexion, wearing a black skull cap, black pea coat, and blue jeans. Officer Loughney relayed the description of the offender over the police radio and called an ambulance. Later, Officer Loughney was present for the show-up identification and heard T.B. identify the suspect as her attacker. Officer Loughney identified defendant in court as the person T.B. identified at the show-up.

¶ 10      Officer Calderon testified that he was on duty at around 4:15 a.m. on February 1, 2014. Calderon and his partner received a flash message regarding a sexual assault while in their marked vehicle, which included a description the offender as a 5'10", 180-pound black man with a medium complexion wearing a black skull cap, a black pea coat, and blue jeans. While the officers canvassed the area near 85th Street and Racine Avenue, they noticed a man matching the description "from head to toe." Officer Calderon identified defendant in court as the man he observed.

¶ 11    As the officers approached defendant, who was wearing a black pea coat, defendant was walking fast and glanced back at the officers multiple times. When asked where he was coming from, defendant said he was coming from 83rd Street and Ashland. Officer Calderon then detained defendant and relocated to the scene for a show-up identification procedure. After T.B. positively identified defendant as the perpetrator, the officers took defendant into custody and transported him to the police station.

¶ 12    Officer Calderon testified that defendant's black pea coat and skull cap were removed because hats and outer garments are not allowed during an arrest process. He acknowledged defendant was wearing a hoodie sweatshirt in his booking photograph and believed defendant's pea coat and skull cap were inventoried prior to taking the booking photo. According to Officer Calderon, defendant was wearing the pea coat and skull cap during the show-up identification. Officer Calderon acknowledged that he and his partner had stopped another black man who "somewhat" matched the description of the offender in the vicinity of the assault while they canvassed the area. While the officers were talking to that man, Officer Calderon noticed defendant, who "exactly" matched the description of the offender, due to his skull cap, pea coat, height, and weight.

¶ 13    Detective Wade Golab testified that after he was assigned to investigate T.B.'s sexual assault, he spoke with her at the hospital and learned that she had identified defendant as her attacker. Detective Golab then spoke with defendant at the police station at about 8:30 a.m. on the day of the attack. Defendant waived his *Miranda* rights and stated that he was at a club near 79th and Ashland, he left that club shortly after midnight, and went to another club on Racine. Defendant denied assaulting or having physical contact with anyone that evening. When Detective Golab asked defendant why someone would accuse him of rape, defendant responded

that if anyone accused him it would have been either a light-skinned woman from the first club or a dark-skinned "shorter" woman with a bag that he first saw walking on Racine and later on Ashland. With respect to the shorter woman, defendant said she looked like she was upset so he went up to her and asked her what was wrong. According to defendant, the woman said that she was too old for defendant and that he looked like a rapist. He then showed the girl that he had money and left.

¶ 14    That night after defendant had been charged, Detective Golab was informed that defendant wanted to speak with him again. During the second interview, defendant informed Detective Golab that he had lied in the prior interview and he admitted to going into the alley with the woman. Defendant made an agreement with the woman that she would give him oral sex in exchange for $30. However, defendant gave her only $10 and he believed that was the reason "she was lying on him." Detective Golab acknowledged he did not memorialize defendant's statement in writing or videotape.

¶ 15    C.G. testified to previously allowed other-crimes evidence. At 10:30 p.m. on February 1, 2008, C.G. was at her prior residence near 79th Street and Marshfield Avenue to check the mail. As C.G. exited the building, two men attempted to force her back inside and she identified defendant as one of the men. Defendant told he had a gun under his shirt, pressed it to C.G.'s back, and said C.G. "better" let him into the building. When she told defendant that she did not have access to the building, the men forced her into her car. Defendant told her he would shoot her if she screamed and then "grabbed and groped on [her] bottom." Defendant got into the passenger seat, his friend got into the back seat, and C.G. got into the driver's seat. Defendant asked C.G. for money and when she told him she did not have any, defendant said she was lying and screamed at her. Defendant instructed C.G. to drive, but since her car did not have gas,

defendant told her to pull into a gas station. When C.G. parked at the gas station, defendant told her "he was going to do sexual things" to her, and specifically, said that he would take C.G. to his friend's house and "they were going to make [her] pop pills and get [her] high and run a train on [her]."

¶ 16    While the other men pumped gas, defendant grabbed C.G.'s face and "shoved his tongue down [her] throat." C.G. attempted to pull away from defendant, but he threatened her with his gun. He put his hands in between her legs and "started feeling on [her] private area" over her clothes, including her breasts and between her legs. She told him to stop, but defendant reminded her that he had a gun. As defendant's friend was pumping gas into her car, C.G. attempted to "stall" and asked defendant if his friend could get her a drink from the gas station. When the other man exited the gas station, C.G. "darted out of the car." She ran into the gas station and screamed to the security guard to call the police. A police car happened to be driving into the gas station at that time. While C.G. was screaming, defendant drove away in her car. The police chased defendant up the street and he crashed her car. C.G. reported the incident and identified defendant in a lineup the following day. Defendant was ultimately charged and convicted of vehicular hijacking. C.G. admitted that she never saw the gun that defendant purportedly possessed.

¶ 17    The parties presented multiple stipulations regarding forensic evidence. Cook County State's Attorney investigator Mary Ember would testify that on June 5, 2014, she collected a buccal swab standard from defendant and inventoried it. Forensic scientist Jennifer Wagenmaker would testify, as an expert in forensic biology, that she tested the sexual assault kit collected from T.B. for the presence of semen. No semen was identified on the oral or vaginal swabs and her examination of the anal swabs and the underwear were inconclusive. No saliva was indicated

on the vaginal swabs. Forensic scientist Debra Klebacha would testify, as an expert in forensic DNA analysis, that she analyzed samples from both T.B. and defendant to obtain their respective DNA profiles. She then extracted DNA from the anal swab and the stain from T.B.'s underwear, but there was insufficient male DNA detected to profile.

¶ 18    After the State rested its case, defendant moved for a directed finding, which the trial court granted for the counts of aggravated criminal sexual assault alleging vaginal penetration. Defendant did not present any additional evidence in his defense. Following arguments, the court found defendant guilty of six counts of aggravated criminal sexual assault and one count of aggravated robbery.

¶ 19    Defendant subsequently filed a motion for a new trial raising multiple claims, including that the trial court erred in allowing C.G.'s testimony regarding other crimes evidence. The court denied the motion. At the sentencing hearing, the court sentenced to two 16-year terms for aggravated criminal sexual assault and a 4-year term for aggravated robbery, to be served consecutively, for an aggregate sentence of 36 years' imprisonment.

¶ 20    On direct appeal, defendant argued that the trial court: (1) erred in admitting the other crimes evidence because that offense was factually dissimilar from the charged crimes and unduly prejudicial; and (2) should have conducted an inquiry pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), when defendant asserted to the court that his attorney was ineffective. *People v. Diggins*, 2019 IL App (1st) 162567-U, ¶ 2. This court found that while the trial court abused its discretion in admitting the other crimes evidence because the prior crime was too dissimilar to the charged offense, the error was harmless "given the strength of the evidence against defendant" and we could not say that outcome would have been different if the other crimes evidence had been excluded. *Id.* ¶¶46-47. We further found that when defendant raised a posttrial

7

claim of ineffective assistance of counsel, the trial court "made no further inquiry or determination on the record regarding whether the claim potentially had merit as it was required to do under *Krankel*." *Id.* ¶ 52. We affirmed defendant's conviction and remanded for the limited purpose of conducting a preliminary *Krankel* inquiry. *Id.* ¶ 53.

¶ 21    In June 2017, while his direct appeal was pending, defendant filed his *pro se* postconviction petition alleging violations of his constitutional rights: (1) the sexual assault kit analysis was improper; (2) his trial counsel was ineffective for failing to call Wagenmaker to testify for the defense; (3) "excessive confinement"; (4) the trial court erred in allowing other crimes evidence; (5) unlawful detention and false arrest by the police when defendant did not fit the description given by the victim; (6) the State failed to prove petitioner guilty beyond a reasonable doubt; (7) petitioner's sentence and conviction are "void on [their] face"; (8) actual innocence; and (9) the prosecutor made false statements at the sentencing hearing. In September 2017, the trial court considered each of the claims raised by defendant and found that the issues raised were frivolous and patently without merit and dismissed the petition.

¶ 22    In October 2017, defendant filed a *pro se* motion to reconsider his postconviction petition and realleged the claims from his petition. Defendant also asserted that he mailed affidavits and supporting documents in support of his claims and there was newly discovered evidence regarding Wagenmaker's testimony regarding the forensic evidence. In April 2018, the trial court denied defendant's motion to reconsider, finding that the court lacked jurisdiction because the motion was filed more than 30 days after the dismissal order. The court further held that even if it had jurisdiction, the motion failed to establish a basis for relief.

¶ 23    This appeal follows.

¶ 24    The Illinois Post-Conviction Hearing Act (Post-Conviction Act) (725 ILCS 5/122-1 through 122-8 (West 2016)) provides a tool by which those under criminal sentence in this state can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both. 725 ILCS 5/122-1(a) (West 2016); *People v. Coleman*, 183 Ill. 2d 366, 378-79 (1998). Postconviction relief is limited to constitutional deprivations that occurred at the original trial. *Coleman*, 183 Ill. 2d at 380. "A proceeding brought under the [Post-Conviction Act] is not an appeal of a defendant's underlying judgment. Rather, it is a collateral attack on the judgment." *People v. Evans*, 186 Ill. 2d 83, 89 (1999). "The purpose of [a postconviction] proceeding is to allow inquiry into constitutional issues relating to the conviction or sentence that were not, and could not have been, determined on direct appeal." *People v. Barrow*, 195 Ill. 2d 506, 519 (2001). Thus, *res judicata* bars consideration of issues that were raised and decided on direct appeal, and issues that could have been presented on direct appeal, but were not, are considered forfeited. *People v. English*, 2013 IL 112890, ¶ 22.

¶ 25    At the first stage, the circuit court must independently review the postconviction petition within 90 days of its filing and determine whether "the petition is frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2016). "A postconviction petition is frivolous or patently without merit when its allegations, taken as true and liberally construed, fail to present the gist of a constitutional claim." *People v. Harris*, 224 Ill. 2d 115, 126 (2007). A petition is frivolous or patently without merit only if it has no arguable basis in law or fact. *People v. Hodges*, 234 Ill. 2d 1, 16 (2009). A petition lacks an arguable basis in law or fact if it is "based on an indisputably meritless legal theory," such as one that is "completely contradicted by the record," or "a fanciful factual allegation," including "those which are fantastic or delusional."

*Hodges*, 234 Ill. 2d at 16-17.

¶ 26    If the court determines that the petition is either frivolous or patently without merit, the court must dismiss the petition in a written order. 725 ILCS 5/122-2.1(a)(2) (West 2016).  At the dismissal stage of a postconviction proceeding, the trial court is concerned merely with determining whether the petition's allegations sufficiently demonstrate a constitutional infirmity that would necessitate relief under the Act. *Coleman*, 183 Ill. 2d at 380.  At this stage, the circuit court is not permitted to engage in any fact-finding or credibility determinations, as all well-pleaded facts that are not positively rebutted by the original trial record are to be taken as true. *Coleman*, 183 Ill. 2d at 385.

¶ 27    On appeal, defendant argues that the trial court erred in dismissing his postconviction petition because he presented the gist of a meritorious claim of ineffective assistance of counsel for failing to file a motion to quash his arrest. Defendant has not challenged the other claims presented in his petition on appeal and has therefore forfeited those claims. *People v. Munson*, 206 Ill. 2d 104, 113 (2002) (concluding that the petitioner abandoned several postconviction claims by failing to raise them on appeal).

¶ 28    The State first contends that defendant did not raise a claim of ineffective assistance of trial counsel for failing to file a motion to quash his arrest in his postconviction petition. In his petition, defendant alleged his attorney was ineffective for failing to call Wagenmaker to testify. In a separate claim, he alleged that he was unlawfully detained by the police because he did not fit the description of the offender. Defendant responds that defendant sufficiently alleged that his trial counsel was ineffective and that his arrest lacked probable cause because he did not fit the description of the offender. According to defendant, these allegations support the claim of ineffective assistance raised on appeal.

¶ 29    Generally, Illinois courts have held that a claim not raised in the postconviction petition cannot be raised for the first time on appeal.  See *People v. Pendleton*, 223 Ill. 2d 458, 475 (2006); *People v. Jones*, 213 Ill. 2d 498, 505 (2004). Section 122-2 of the Post-Conviction Act specifically provides that "the petition shall *** clearly set forth the respect in which petitioner's constitutional rights were violated," and, section 122-3 provides that "[a]ny claim of substantial denial of constitutional rights not raised in the original or amended petition is waived" (725 ILCS 5/122-2 (West 2016); 725 ILCS 5/122-3 (West 2016)). While our supreme court may relax the forfeiture rule by invoking its supervisory power, this court "is not free, *** to excuse, in the context of postconviction proceedings, an appellate waiver caused by the failure of a defendant to include issues in his or her postconviction petition." *Jones*, 213 Ill. 2d at 508.

¶ 30    While we are to liberally construe defendant's allegations at this stage of postconviction review, he did not allege ineffective assistance related to his arrest. Rather, defendant did raise the basic facts of this claim in his petition in separate claims. However, even if we determine under a liberal construction that defendant sufficiently set forth the gist of this claim, defendant's claim fails for the following reasons.

¶ 31    Defendant's claim could have been raised on direct appeal, and thus, it has been forfeited. The State points out that the facts supporting defendant's contention that he did not match the description of the offender are contained in the trial court record. As previously stated, postconviction issues that could have been, but were not, raised on direct appeal are forfeited. *English*, 2013 IL 112890, ¶ 22.

¶ 32    Specifically, defendant relies in his brief on trial testimony contained in the report of proceedings as well as his arrest photograph which was included in the common law record. The testimony at trial indicated that T.B. described the offender as 5'10", 180-pound black man with

11

a medium complexion wearing a black skull cap, a black pea coat, and blue jeans. Officer Calderon testified that defendant matched the description "from head to toe." T.B. testified that she identified defendant at the scene as the offender. Further, Officer Calderon explained that defendant was not wearing the pea coat or skull cap in his arrest photo because hats and outerwear are not permitted to be worn for the booking photographs. In response, defendant asserts that the claim has not been forfeited because additional information to support the claim was only available in his petition and he could not have raised this claim on direct appeal. However, this additional information was defendant's own allegation that at the time he was arrested, he was wearing a gray hooded sweatshirt "depicted in his arrest photo," black pants, and no cap.

¶ 33     We agree with the State that this issue could have been raised on direct appeal. While defendant contends that he could not have raised the claim earlier, the basis for this claim is based on facts contained in the trial court record. As he argues, the arrest photo depicted him wearing a gray hooded sweatshirt without a hat. Defendant's own allegations are premised on this depiction of what he was wearing that was included in the trial record. Since this claim could have been raised on direct appeal, it has been forfeited. See *English*, 2013 IL 112890, ¶ 22.

¶ 34     Forfeiture aside, we further find that defendant's claim lacks merit because defendant cannot establish an arguable claim of ineffective assistance for failing to file a motion to quash arrest. Claims of ineffective assistance of counsel are resolved under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court delineated a two-part test to use when evaluating whether a defendant was denied the effective assistance of counsel in violation of the sixth amendment. Under *Strickland*, a defendant must demonstrate that counsel's performance was deficient and that such deficient performance substantially

prejudiced defendant. *Strickland*, 466 U.S. at 687. To demonstrate performance deficiency, a defendant must establish that counsel's performance fell below an objective standard of reasonableness. *People v. Edwards*, 195 Ill. 2d 142, 163 (2001). "A defendant is entitled to reasonable, not perfect, representation, and mistakes in strategy or in judgment do not, of themselves, render the representation incompetent." *People v. Fuller*, 205 Ill. 2d 308, 331 (2002). "Counsel's strategic choices are virtually unchallengeable. Thus, the fact that another attorney might have pursued a different strategy, or that the strategy chosen by counsel has ultimately proved unsuccessful, does not establish a denial of the effective assistance of counsel." *Id*.

¶ 35    In evaluating sufficient prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. If a case may be disposed of on the ground of lack of sufficient prejudice, that course should be taken, and the court need not ever consider the quality of the attorney's performance. *Strickland*, 466 U.S. at 697. "*Strickland* requires actual prejudice be shown, not mere speculation as to prejudice." *People v. Bew*, 228 Ill. 2d 122, 135 (2008).

¶ 36    Further, the decision whether to file a motion to quash arrest and suppress evidence is generally a matter of trial strategy entitled to great deference, and a defendant shows ineffective assistance based on the failure to file such a motion if both (1) the unargued motion was meritorious and (2) a reasonable probability exists that the trial outcome would have been different had the evidence been suppressed. *People v. Gayden*, 2020 IL 123505, ¶ 28. The failure to file a motion to suppress does not establish incompetent representation when it turns out that the motion would have been futile. *People v. Givens*, 237 Ill. 2d 311, 331 (2010). At the first

stage of postconviction proceedings, a petition alleging ineffective assistance of counsel may not be dismissed if: (1) counsel's performance arguably fell below an objective standard of reasonableness; and (2) the petitioner was arguably prejudiced as a result. *Hodges*, 234 Ill. 2d at 17.

¶ 37    Here, defendant cannot show that a motion to quash his arrest was arguably meritorious. Defendant argues that he was not wearing jeans, a pea coat, or a skull cap, but instead was wearing a gray hooded sweatshirt, black pants, and no hat. He also contends that at the time of his arrest, he had facial hair, but facial hair was not included in the description of the offender. We note that a failure to notice facial hair is not fatal to a positive and otherwise credible identification. *People v. Slim*, 127 Ill. 2d 302, 310 (1989).

¶ 38    "Both the fourth amendment and the Illinois Constitution of 1970 guarantee the right of individuals to be free from unreasonable searches and seizures." *People v. Colyar*, 2013 IL 111835, ¶ 31 (citing U.S. Const., amend. IV, and Ill. Const. 1970, art. I, § 6). "This court has explained that '[t]he "essential purpose" of the fourth amendment is to impose a standard of reasonableness upon the exercise of discretion by law enforcement officers to safeguard the privacy and security of individuals against arbitrary invasions.' " *Id.* (quoting *People v. McDonough*, 239 Ill. 2d 260, 266 (2010), quoting *Delaware v. Prouse*, 440 U.S. 648, 653-54 (1979)).

¶ 39    "Probable cause to arrest exists when the facts known to the officer at the time of the arrest are sufficient to lead a reasonably cautious person to believe that the arrestee has committed a crime." *People v. Wear*, 229 Ill. 2d 545, 563-64 (2008). "That is, the existence of probable cause depends upon the totality of the circumstances at the time of the arrest." *Id.* at 564. " ' "The standard for determining whether probable cause is present is probability of

criminal activity, rather than proof beyond a reasonable doubt. [Citations.]" ' " *Id.* (quoting *People v. Garvin*, 219 Ill. 2d 104, 115 (2006), quoting *People v. Lee*, 214 Ill. 2d 476, 485 (2005)). Further, "probable cause does not even demand a showing that the belief that the suspect has committed a crime be more likely true than false." *Id.*

¶ 40       Here, the record establishes that the police had probable cause to arrest defendant and belies defendant's contention that he did not match the description of the offender. Immediately after the assault, T.B. called 911 and described her attacker as a black man with a medium complexion wearing a pea coat and a black skull cap. When Officer Loughney arrived at the scene, T.B. described the offender as a "male black medium complexion, five-foot-ten,180 pounds, wearing a black skullcap, black pea coat, and blue jeans." The officer then broadcast that description over the police radio.

¶ 41       Officer Calderon received a flash message over police radio about the sexual assault with the following description: "Male, black 5'10, 180 wearing a black skull cap, pea coat, blue jeans." He and his partner then began to canvass the area for the offender. When the officer was near 85th and Racine, "roughly a quarter mile" from the location of the sexual assault, he observed an individual who fit the description "from head to toe." Officer Calderon and his partner approached defendant and immediately took him to the scene of the assault for a show-up. T.B. there and then identified defendant as her attacker. She further testified that during the show-up, defendant was wearing a pea coat and a hat.

¶ 42       Officer Calderon then placed defendant under arrest and transported to the police station. During processing, defendant's pea coat and skull cap were removed for the arrest photo. Officer Calderon explained that when individuals are being processed, they are not allowed to wear "hats, outer garments that may be covering or obstructing." Officer Calderon believed that he

inventoried the pea coat and hat. The officer confirmed that defendant was wearing the pea coat and skull cap at the time of the show-up.

¶ 43    Defendant offers no discussion regarding the lack of probable cause other than the assertion that he did not fit the description and the record belies defendant's contention. Further, defendant fails to argue at what point in the encounter was he considered to be under arrest. Nevertheless, the totality of the circumstances established that probable cause existed at the time of defendant's arrest based on both T.B.'s description and subsequent identification of defendant as well as Officer Calderon's testimony regarding his stop of defendant because defendant matched the description and was observed a quarter of a mile from the scene of the attack. Given these facts, a motion to quash his arrest would not have been successful. Thus, defendant's claim of ineffective assistance of counsel fails and his postconviction petition was properly dismissed as frivolous and patently without merit.

¶ 44    Based on the foregoing reasons, we affirm the decision of the circuit court of Cook County.

¶ 45    Affirmed.